**DECLARATION OF JAMES M. KELLEY**

I, James Madison Kelley, declare as follows:

1. I am a computer expert over the age of eighteen years, am of sound mind, have never been convicted of a felony or crime of moral turpitude; I am competent in all respects to make this declaration. I have personal knowledge of the matters declared herein, and if called to testify to the same, I could and would competently testify thereto.
2. I have studied numerous computerized forgeries and have developed scientifically sound methods of distinguishing computer generated signature facsimiles from direct copies of original signatures. A true and correct copy of my current Curricula Vitae ("CV") is attached as **"Exhibit 1".**
3. I was asked to review the document in question to determine if the signatures of Clarence Hugh Jonson and Bonnie Louise Jonson are authentic.
4. I have examined the questioned document that contains a purported color copy of the original Note with special attention to page 54 that contains the questioned signatures of Bonnie Louise Jonson and Clarence Hugh Jonson. The questioned signatures versions are prefix labeled ("Q") and attached hereto as **"Exhibit 2".**
5. I have obtained unquestioned original ink signatures from Bonnie Louise Jonson and Clarence Hugh Jonson. These unquestioned signatures have been color scanned and compared with the questioned signatures. The unquestioned signature versions are prefixed labeled ("C") for "comparison" and attached hereto as **"Exhibit 3".**
6. I have extracted the file metadata that contains information about the creation and modification of the document as well as the name of the document creator -"schaj". The file metadata data prefix labeled ("M") is attached hereto as **"Exhibit 4".**
7. I also examined the entire Questioned document (pages 1-72) in Photoshop, Illustrator and Gimp 2.6. The entire document was produced in PDF file.

EXHIBIT 6
PAGE 1 OF 15

8. It can be easily seen that the comparison signatures **"Exhibit 3"** are quite different than the questioned Note signatures in "**Exhibit 2**".

9. Pertaining to the alleged signatures of Clarence Hugh Jonson and Bonnie Louise Jonson on the Q1 document. This Examiner's professional opinion is that Q1 document is not a copy made directly from the original Note; and the signatures thereon were systematically fabricated to make them appear as direct copies of the "blue Ink" signature of the original Note. The examiners opinion is that the Jonson signatures are forgeries.

10. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on January 2, 2013 in Saratoga, California.

Further the Declarant Sayeth Naught.

Executed on this 2nd day of January 2013 at Saratoga, California.

James Madison Kelley

James Madison Kelley
jmadisonkelley@gmail.com

**EXHIBIT 1**

Dr. James M. Kelley
Computer Forensic Expert
BP Investigative Agency, LLC
5200 SW Meadows, Ste. 150
Lake Oswego, OR 97035
Office: (503) 726-5954
Fax: (503) 726-5911

**Curriculum Vitae**

Dr. James Kelley has 30 years experience in military and commercial computer systems and has developed and sold computers and software around the world.

He is now applying his computer skills to the detection of forgeries committed with highly sophisticated computer programs. It is now possible to exactly copy the shape and ink color of a person's signature and fabricate highly realistic financial documents using high technology computer programs such as Adobe Photoshop, Adobe Illustrator. GIMP, and a host of other new programs that were originally designed for creating photographic portfolios. Traditionally trained forensic analysts usually are not computer experts trained in printer technology and computer photo processing and illustration software. There has been a plethora of computerized forgery in foreclosure cases across the nation and there is an urgent need for this specialization.

Dr. Kelley gives verbal opinions, court qualified opinions and testimony in high technology computer document forgery cases. This is of great benefit to attorneys and their clients.

**Relevant Experience**:

Dr. Kelley has experience in the design of airborne radar and Electronic Countermeasures Systems at the following companies:

Raytheon Missile Systems Division Senior where he was Senior Engineer in charge of the computer program development for pulse doppler airborne phased array attack radar. The system was successfully tested at Wright Patterson Air Force base;

Raytheon Electronic Countermeasures Systems where he invented a digital computer capable of collecting, sorting and processing high-density enemy radio emissions for the Advanced Manned Strategic Aircraft, inter alia. Worked directly for the chief scientist of Raytheon;

At Litton Systems Dr. Kelley developed and tested a method that increased the target detection range by a factor of 4 for wideband receivers. This permitted early detection of enemy aircraft and ground-based threats by fighter jets.

At Litton Systems Dr. Kelley utilized image processing hardware and software as part of an effort to defend helicopters from shoulder launched enemy missiles.

As an Engineering Fellow at Chips and Technologies, Dr. Kelley solved disk controller data separation problems and developed a line of for the PC disk controller for high volume manufacturing in Asia.

He has developed and applied cryptographic methods and software for password protection of computer programs and storage systems.

Dr. Kelley has three U.S. patents and one patent pending and is currently active in the design of novel database architectures and networking architectures.

He has developed methods for determining the authenticity of documents in legal proceedings when the documents are computer generated. He is an experienced witness and is familiar with both state and federal court procedures. He works with the traditional forensic examiners when required.

**Education:**

Stanford Executive Institute
Ph.D. University of California, Santa Barbara, Electrical and Computer Engineering
M.S.E.E. University of California, Santa Barbara, Electrical Engineering
B.A. in Mathematics San Jose State University



EXHIBIT 6
PAGE 4 OF 15

**EXHIBIT 2**

**QUESTIONED COMPARISON SIGNATURES**

**Q1** **Questioned Signature (Page 54)**

**Q2** **Bonnie Louise Jonson's Signature Enhanced Background**

**Q3** **Clarence Hugh Jonson's Signature Enhanced Background**

**Q4** **Bonnie Louise Jonson's Signature Diminished Background**

**Q5** **Clarence Hugh Jonson's Signature Diminished Background**

V2 WBCD LOAN # [redacted]6774

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_______________ (Seal)
CLARENCE HUGH JONSON

_______________ (Seal)
BONNIE LOUISE JONSON

EXHIBIT 6
PAGE 6 OF 15
[Sign Original Only]

Q1

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3200 1/01
© 1999-2007 Online Documents, Inc.
Page 3 of 3

F3200NOT 0701
12-29-2009 13:12

[redacted]6774
ORIGINAL NOTE-1

54

Q2

EXHIBIT 6
PAGE 7 OF 15

Q3

UNDERSIGNED.
(Seal)
CLARENCE HUGH JONSON

Q4



BONNIE LOUISE JONSON

(Seal)

EXHIBIT 6
PAGE 9 OF 15

Q5

UNDERSIGNED.

(Seal)

**CLARENCE HUGH JONSON**

EXHIBIT 6
PAGE 10 OF 15

**EXHIBIT 3**

**UNQUESTIONED COMPARISON SIGNATURES**

**C1 The Jonsons' Comparison Signatures**

**C2 The Jonsons' Signatures with Enhanced Background**

**C3 The Jonsons' Signatures with Diminished Background**

Declaration of Jonson Forgery 7

EXHIBIT 6
PAGE 11 OF 15

C1

E. Hugh Jonson

Bonnie J. Jonson



EXHIBIT 6
PAGE 13 OF 15

C3

EXHIBIT 6
PAGE 14 OF 15

# EXHIBIT 4

## QUESTIONED DOCUMENT METADATA

```
<?xpacket begin="ï»¿" id="W5M0MpCehiHzreSzNTczkc9d"?>
<x:xmpmeta xmlns:x="adobe:ns:meta/" x:xmptk="Adobe XMP Core 4.2.2-c063 53.352624, 2008/07/30-18:12:18        ">
   <rdf:RDF xmlns:rdf="http://www.w3.org/1999/02/22-rdf-syntax-ns#">
      <rdf:Description rdf:about=""
            xmlns:xmp="http://ns.adobe.com/xap/1.0/">
         <xmp:ModifyDate>2012-12-18T17:41:23-08:00</xmp:ModifyDate>
         <xmp:CreateDate>2012-12-13T13:54:58-08:00</xmp:CreateDate>
         <xmp:MetadataDate>2012-12-18T17:41:23-08:00</xmp:MetadataDate>
         <xmp:CreatorTool>PScript5.dll Version 5.2.2</xmp:CreatorTool>
      </rdf:Description>
      <rdf:Description rdf:about=""
            xmlns:dc="http://purl.org/dc/elements/1.1/">
         <dc:format>application/pdf</dc:format>
         <dc:creator>
            <rdf:Seq>
               <rdf:li>schaj</rdf:li>
            </rdf:Seq>
         </dc:creator>
      </rdf:Description>
      <rdf:Description rdf:about=""
            xmlns:xmpMM="http://ns.adobe.com/xap/1.0/mm/"
xmlns:stEvt="http://ns.adobe.com/xap/1.0/sType/ResourceEvent#">
     <xmpMM:DocumentID>uuid:a0670987-3ff1-4639-9547-
07c8c234ff02</xmpMM:DocumentID>
         <xmpMM:InstanceID>uuid:2cfea610-6153-489d-b34d-
2c77f4983875</xmpMM:InstanceID>
         <xmpMM:History>
            <rdf:Seq>
               <rdf:li rdf:parseType="Resource">
                  <stEvt:action>converted</stEvt:action>
                  <stEvt:parameters>from application/pdf to
application/vnd.adobe.photoshop</stEvt:parameters>
               </rdf:li>
            </rdf:Seq>
         </xmpMM:History>
      </rdf:Description>
      <rdf:Description rdf:about=""
            xmlns:pdf="http://ns.adobe.com/pdf/1.3/">
         <pdf:Producer>Adobe Acrobat 10.1.3 Paper Capture Plug-in;
modified using iText 2.1.7 by 1T3XT</pdf:Producer>
      </rdf:Description>
      <rdf:Description rdf:about=""
            xmlns:photoshop="http://ns.adobe.com/photoshop/1.0/">
         <photoshop:ColorMode>3</photoshop:ColorMode>
         <photoshop:ICCProfile>sRGB IEC61966-2.1</photoshop:ICCProfile>
      </rdf:Description>
   </rdf:RDF>
</x:xmpmeta>
<?xpacket end="w"?>
```

[Emphasis added]

V2 WBCD LOAN # [redacted]6774
MIN: [redacted]7431

# NOTE

DECEMBER 29, 2009 [Date] | Anacortes, [City] | WASHINGTON [State]

6818 GIBRALTER PL, ANACORTES, WA 98221-8344
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $403,080.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is FLAGSTAR BANK, FSB, A FEDERALLY CHARTERED SAVINGS BANK.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.875%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1ST day of each month beginning on FEBRUARY 1, 2010. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JANUARY 1, 2040, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
5151 CORPORATE DR
TROY, MI 48098-2639

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S. $2,384.37.

EXHIBIT 07
PAGE 1 OF 4

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**V2 WBCD LOAN #** ▓▓▓▓**5774**

sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000**% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

EXHIBIT **07**

PAGE **2** OF **4**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to

V2 WBCD LOAN # [redacted]5774

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

(Seal)
CLARENCE HUGH JONSON

(Seal)
BONNIE LOUISE JONSON

EXHIBIT 07
PAGE 3 OF 4

PAY TO THE ORDER OF
WITHOUT RECOURSE
FLAGSTAR BANK, FSB

BY: ______________________
JEAN R. CAW[illegible]CK, SENIOR VICE PRESIDENT

BY: ______________________
JOHN P. MARECKI, FIRST VICE PRESIDENT

EXHIBIT 07
PAGE 04 OF 04